Stephen M. Doniger (SBN 179314)
stephen@donigerlawfirm.com
Kelsey Schultz (SBN 328159)
kschultz@donigerlawfirm.com
DONIGER / BURROUGHS
603 Rose Avenue
Venice California 90291
Telephone: (310) 590-1820

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH WATERMAN, an individual; NY BLACK AND GOLD CORPORATION, doing business as "Black & Gold," a California corporation, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., d/b/a "Facebook", a Delaware corporation; and DOES 1 through 10, <br><br> Defendants. | Case No.: <br><br> **PLAINTIFFS' COMPLAINT FOR:** <br><br> 1. **COPYRIGHT INFRINGEMENT** <br> 2. **CONTRIBUTORY COPYRIGHT INFRINGEMENT** <br> 3. **VICARIOUS COPYRIGHT INFRINGEMENT** <br><br> <u>Jury Trial Demanded</u> |

ELIZABETH WATERMAN and NY BLACK AND GOLD CORPORATION, doing business as "Black & Gold," by and through their undersigned attorneys, hereby pray to this honorable Court for relief based on Defendant META PLATFORMS, INC.'s, doing business as "Facebook," rampant acts of copyright infringement and the proliferation of copyright-infringing content that FACEBOOK has knowingly allowed, encouraged, and financially benefitted from:

## JURISDICTION AND VENUE

1.      This action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq*.

2.      This Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1338 (a)-(b).

3.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391(c) and 1400(a) because this is the judicial district in which a substantial part of the acts and omissions giving rise to the claims occurred.

## PARTIES

4.      Plaintiff ELIZABETH WATERMAN ("WATERMAN") is an individual residing and conducting business in California.

5.      Plaintiff NY BLACK AND GOLD CORPORATION, doing business as "Black & Gold Corporation," "Black & Gold," and "Black & Gold Agency" ("B&G") (collectively with WATERMAN, "Plaintiffs"), is a California corporation organized and existing under the laws of the state of California with its principal place of business at 3103 17th Street, Santa Monica, California 90405. WATERMAN is the founder, owner, director, and officer of B&G.

6.      META PLATFORMS, INC., doing business as "Facebook" ("FACEBOOK"), is a Delaware Corporation with its primary place of business located at 1601 Willow Road, Menlo Park, California 94025, and is the owner, operator, and/or controller of the website facebook.com and its related and

affiliated subdomains (collectively, "FACEBOOK'S Platform"). FACEBOOK maintains one or more offices in Los Angeles, California and/or this judicial district.

7.    Upon information and belief, Plaintiffs allege that Defendants DOES 1 through 10 ("DOE Defendants") (collectively with FACEBOOK, "Defendants") are other parties not yet identified who have infringed Plaintiffs' copyrights, have contributed to the infringement of Plaintiffs' copyrights, or have engaged in one or more of the wrongful practices alleged herein. The true names, whether corporate, individual, or otherwise, of DOE Defendants are presently unknown to Plaintiffs, which therefore sue said DOE Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when the same have been ascertained.

8.    Upon information and belief, Plaintiffs allege that, at all relevant times, each of the Defendants was the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of the remaining Defendants, and was at all times acting within the scope of such agency, affiliation, alter-ego relationship, and/or employment; and actively participated in, subsequently ratified, and/or adopted each of the acts or conduct alleged, with full knowledge of all the facts and circumstances of each violation of Plaintiffs' rights and the damages to Plaintiffs proximately caused thereby.

## **FACEBOOK'S VOLITIONAL CONDUCT**

9.    FACEBOOK's Platform is an online social media and social networking service. After registering on that Platform, users can create a profile revealing information about themselves; post text, photos, and multimedia to share with other users and/or publicly; communicate with other users and receive notifications on their activities; engage with (e.g., comment on, like, share, react to, etc.) other users' posts; and more.

10.    The more time users spend on FACEBOOK's Platform, and the more they engage with content on that Platform during that time, the more data FACEBOOK collects on those users, and the more FACEBOOK financially benefits; that is, FACEBOOK uses the data it collects to display advertisements, offers, and other sponsored (i.e., paid) content to those users that, based on FACEBOOK's predictions, they are likely to find relevant. Thus, FACEBOOK is incentivized to find ways to make its Platform, and the content thereon, as engaging as possible.

11.    However, these practices (among others) have landed FACEBOOK in hot water over the years. For example, FACEBOOK has often been criticized for user privacy violations; political manipulation; mass surveillance; causing or contributing to adverse psychological effects in its users, such as addiction and low self-esteem; and enabling the proliferation of fake news, conspiracy theories, and content that infringes the rights of copyright holders.

12.    This lawsuit concerns, in part, FACEBOOK's direct and pervasive participation in infringing the copyrights in WATERMAN's Subject Photographs (defined below) by exercising control over unauthorized copies of the Subject Photographs (collectively, the "Infringing Uses") on FACEBOOK's Platform; selecting the Infringing Uses for upload, download, transmission, and/or storage to/from FACEBOOK's Platform and servers; and/or instigating the copying, display, publication, reproduction, and/or distribution of the Infringing Uses on FACEBOOK's Platform.

13.    Specifically, upon information and belief, Plaintiffs allege that FACEBOOK (1) selects, curates, suggests, and recommends photographs (including the Infringing Uses) for and to users, irrespective of any user command to display, distribute, or otherwise use those photographs on FACEBOOK's Platform; (2) stores, caches, and distributes multiple copies of photographs on its servers and Platform, irrespective of any user command to do so; and (3) modifies

COMPLAINT

and manipulates photographs on its Platform for and/or through its Photo Search function, as well as recognizing, classifying, tagging, applying text descriptions to, refining, and enhancing photographs.

**A. FACEBOOK selects, curates, suggests, and recommends photographs for and to users, irrespective of any user command to do so.**

14.    Upon information and belief, Plaintiffs allege that while FACEBOOK users may decide what to post on their individual pages, FACEBOOK takes that content and decides what photographs are displayed to users in their respective (and entirely separate and distinct) News Feeds, and FACEBOOK's "apps"— including "Moments" and "Place Tips"—suggest and recommend photographs to non-posting users that would otherwise only be seen on the FACEBOOK page of the posting user(s).

**1. FACEBOOK decides what photographs are displayed to users in their News Feeds.**

15.    The "home" page that is displayed to a user upon logging into FACEBOOK's Platform is not the user's personal profile (i.e., the page that users curate themselves), but what is called the "News Feed." According to FACEBOOK, the News Feed is the list of stories that includes status updates, photos, videos, links, likes from other users, pages and groups that the user follows, and more.

16.    Posts that are displayed to a user at or toward the top of the News Feed are influenced by that user's connections and activity on FACEBOOK's Platform. That is, posts on a user's News Feed are not displayed in chronological order; rather, they are displayed based on a ranking assigned by FACEBOOK, not the users. Among other things, the number of comments, likes, and reactions a post receives; what kind of post it is (e.g., another user's photograph); how often the user interacts with that type of content; how often the user interacts with posts

from certain other users, groups, or pages; and more, affect where FACEBOOK places, or ranks, that post in that user's News Feed, if it appears in the Feed at all.

17.    It is also no secret that FACEBOOK takes it upon itself to suggest posts to users in their News Feeds. FACEBOOK personalizes these suggested posts based on what it deems may be relevant to that user based on its analysis of that user's activity on FACEBOOK's Platform (e.g., who interacted with the post, the topic or subject of the post, the location of the post, etc.). FACEBOOK's suggested posts comprise, *inter alia*, videos, photographs, and/or articles from pages or groups that the user does not already follow.

18.    For example, FACEBOOK suggests "memories"—e.g., photographs a user was previously tagged in—at the top of users' News Feeds. FACEBOOK calls this its "On This Day" experience.

19.    FACEBOOK, through On This Day, shows users the memories that, according to FACEBOOK's decisions, those users most likely want to see. To decide what "On This Day" content to display to users, FACEBOOK, again on its own accord, filters and ranks the content based on predicted likelihood of engagement.

20.    For these purposes, FACEBOOK ranks "On This Day" content according to, *inter alia*, what it calls "content understanding." This means that, with respect to photographs, FACEBOOK understands what is in a particular photograph—down to detecting objects, scenes, actions, and places of interest, and whether it contains "objectionable content"—which allows FACEBOOK to know that, e.g., a photograph shows a cat, is about skiing, was taken at the beach, or includes the Eiffel Tower.

21.    FACEBOOK's News Feed content curation and selection is performed by teams of employees in conjunction with processes and software that FACEBOOK designed, engineered, and/or programmed to do the same.

**2. FACEBOOK's "apps"—including "Moments" and "Place Tips"— suggest and recommend photographs to users.**

22.    Upon information and belief, Plaintiffs allege that FACEBOOK employs numerous applications, or "apps," on its Platform designed to foster user engagement. At least two of those apps—called "Moments" and "Place Tips"— also foster copyright infringement.

23.    Moments is an app that harvests, stores, and shares a user's photographs on FACEBOOK's Platform. The essential purpose of the Moments app is to, as its name suggests and as FACEBOOK puts it, "capture photos of the moments in our lives."[1]

24.    Through the Moments app, FACEBOOK trawls the photographs on a user's device (e.g., a mobile phone or tablet) and stores copies of those photographs on FACEBOOK's servers. Then, on its own accord, FACEBOOK suggests which of those photographs that user should share and how they should be tagged. FACEBOOK makes those suggestions based in part on FACEBOOK applying, *inter alia*, Bluetooth, location, and/or facial recognition software to the copies of the photographs stored on its servers.

25.    FACEBOOK also connects multiple users to single moments as "members" of that moment, and makes copies of the data comprising that moment available to those members.

26.    FACEBOOK has summarized the work of the Moments app suggestions as follows: "If friends of yours are recognized in a photo you take, that's a signal that they probably want the photo. If you took other photos around that time or at the same event, they may want those photos, too. Your friends may want to give you the photos that they took around that time, as well."

---

[1] Upon information and belief, Plaintiff alleges that the app may no longer be active on FACEBOOK's Platform, but that, even if so, FACEBOOK continues to make those captured "Moments" available to users.

27.    Similarly, Place Tips is an app through which FACEBOOK displays notifications at the top of a user's News Feed when that user is in a particular location and there is content (e.g., reactions) from other users relevant to that location.

28.    The notifications that FACEBOOK surfaces to users through Place Tips include, *inter alia*, posts, photographs (including popular public photographs), and reviews. FACEBOOK also makes those photographs searchable (Plaintiffs' allegations as to FACEBOOK's Photo Search function are set forth below).

29.    FACEBOOK calls the notifications that are displayed "arbitrary aggregations of data"—e.g., compiling and displaying a selection of photographs from users at a particular place—and FACEBOOK "has a very high level of control" over them.

30.    FACEBOOK's Moments and Place Tips apps are powered by FACEBOOK employees in conjunction with processes and software that FACEBOOK designed, engineered, and/or programmed.

**B.  FACEBOOK stores, caches, and distributes multiple copies of photographs on its servers and Platform, irrespective of any user command to do so.**

31.    FACEBOOK calls itself "the biggest photo sharing website." FACEBOOK attributes a vast majority of that "sharing" to two features on its Platform: News Feed and albums. Indeed, FACEBOOK has stated that "News Feed drives much of the traffic" for photographs displayed on FACEBOOK's Platform.

32.    To live up to that proclamation, FACEBOOK generates and stores multiple copies of photographs on its Platform. Additionally, FACEBOOK also resizes and/or crops those copies, each of which FACEBOOK recognizes "as separate objects." FACEBOOK creates and stores these multiple copies of photographs on its own volition.

33.     FACEBOOK's servers on which these photographs are copied and stored are called "Haystacks," and each photograph is a "needle." FACEBOOK assigns unique identifiers to each needle for ease of identifying in, and/or recalling from, the Haystacks. FACEBOOK does not automatically delete needles in its Haystacks in response to user requests. When the Haystack is full, FACEBOOK creates a copy of that Haystack that just skips deleted or duplicated needles.

34.     Moreover, FACEBOOK maintains its own edge and origin caches—a cache is a hardware or software component that stores a copy of data (e.g., a photograph) so future requests for that data can be served faster to an end user—so that photographs can be served from FACEBOOK's Haystacks to FACEBOOK's Platform entirely by FACEBOOK. FACEBOOK caches copies of photographs in different layers of its caches based on popularity across the Platform.

35.     Examples of FACEBOOK's storage, caching, and delivery processes for photograph uploading and downloading are below:

/ / /
/ / /
/ / /
/ / /

COMPLAINT

# Haystack based Design - Photo Upload



/ / /
/ / /
/ / /
/ / /

COMPLAINT



**C. FACEBOOK manipulates photographs on its Platform through its Photo Search function, as well as recognizing, classifying, tagging, applying text descriptions to, refining, and enhancing photographs.**

36.     FACEBOOK delivers photographs to its users—e.g., when it resurfaces "memories" on its Platform—by, *inter alia*, enabling its Platform to recognize photographs; for example, recognizing that a photograph is of a bird, and more specifically an Eastern Meadowlark, and even more specifically an Eastern Meadowlark perched on a bed of snow.

37.     FACEBOOK has "individually labeled" photographs on its Platform by "human annotators." These annotators—researchers and engineers employed by FACEBOOK—have used their "hand-labeled data sets" to engage in the "labor-intensive supervised learning process" of training FACEBOOK's systems to recognize and classify the subject matter of photographs with specificity and accuracy using hashtags FACEBOOK selected from its Platform.

38.     FACEBOOK uses these and other photograph recognition and classification techniques (e.g., visual recognition technology, once again aided by human annotators, enabling the systems supporting FACEBOOK's Platform to segment photographs into objects and pixels and thereby recognize and describe those objects without an explicit tag on each photograph) to, *inter alia*, change how FACEBOOK ranks photographs in users' News Feed and, as a result, make FACEBOOK's photograph suggestions and recommendations more engaging.

39.     Likewise, FACEBOOK's "Photo Search team" helped build an indexing system to allow FACEBOOK's Platform to "better understand what's in an image," as well as "improve the search and retrieval process" by improving "the accuracy of image searches based on visual content in the photo and searchable text."

40.     Specifically, that indexing system was designed "to search trillions of edges between tens of billions of users and entities," "power multiple components in [FACEBOOK's Platform]," and "retrieve objects from the social graph based on the relationships between them, such as 'My friends who live in San Francisco.'" As a result, the "Photo Search" function on FACEBOOK's Platform sorts and scores the search results based on relevancy rankings.

41.     To make this possible, FACEBOOK processes photographs on its Platform "to extract searchable semantic meaning" through a system that FACEBOOK calls "the image understanding engine." Similar to FACEBOOK's photograph classification and recognition functions, this engine was trained through human-aided annotations.

42.     The "image understanding engine" is employed to retrieve, deduplicate, and rank the results of what FACEBOOK collects through its Photo Search function. And that collection is done via "object tags and semantic embeddings"—including "concepts" such as scenes, animals, attractions, and clothing items—that FACEBOOK stores and applies to photographs. FACEBOOK

offers these examples to illustrate the process: "[T]he query concepts are directly correlated to a photo's concepts for the query 'Central Park' to promote on-topic photos and remove off-topic photos during the ranking." Similarly, "[i]f a query about Halloween triggers both the intent for public photos and photos of friends in Halloween costumes, both the public and social photo verticals will be searched."

## FACEBOOK'S NOMINAL PROCESS FOR REMOVING COPYRIGHT-INFRINGING CONTENT

43.     Every user of FACEBOOK's Platform agrees to FACEBOOK's Terms of Service. By agreeing to those Terms, those users agree not to do or share anything on FACEBOOK's Platform that "infringes or violates someone else's rights, including their intellectual property rights." FACEBOOK maintains the right and ability to remove IP-infringing content.

44.     If a copyright holder believes that content on FACEBOOK's Platform infringes their copyright(s) in their protected work(s), the copyright holder can, *inter alia*, contact FACEBOOK's designated agent under the Digital Millenium Copyright Act ("DMCA"). If a copyright holder does so to submit a claim of copyright infringement, FACEBOOK asks for (1) contact information (of the copyright holder or authorized representative); (2) a description of the copyrighted work allegedly infringed; (3) a description of the allegedly infringing content; (4) information for FACEBOOK to locate the allegedly infringing content on its Platform (which, according to FACEBOOK, the "easiest" of which is web addresses ("URLs") for the allegedly infringing content); (5) a declaration; and (6) a signature (collectively, a "Takedown Notice"). These elements are essentially the elements of an effective Takedown Notice under the DMCA, 17 U.S.C. § 512.

45.     After submitting a Takedown Notice, FACEBOOK represents that the copyright holder will receive an automated message that contains information about the Notice and a claim number. FACEBOOK further represents that it

"might" respond to the Notice and ask for more information, and in the event that it does so the copyright holder should respond directly to that message.

46.    If a user repeatedly posts content that infringes the intellectual property rights of others, that user's account "may" be disabled, or that user may lose "access to certain features or functionality" on FACEBOOK's Platform or experience limited "ability to post photos or videos," under FACEBOOK's four-paragraph repeat infringer policy.

## FACEBOOK TURNS A BLIND EYE TO UNAUTHORIZED CONTENT ON ITS PLATFORM

47.    Upon information and belief, Plaintiffs allege that despite its nominal repeat infringer policy, FACEBOOK allows copyright-infringing content to flourish on its Platform, and even aids it. FACEBOOK's actual knowledge of that infringing content, and its conscious actions (and inactions) in the face of the widespread dissemination of that content, is well-documented.

48.    Upon information and belief, Plaintiffs allege that FACEBOOK's own research report(s) revealed that approximately 40% of the traffic on FACEBOOK's Platform was to pages that displayed copyright-infringing content. Plaintiffs further allege that a true and correct excerpt of one such FACEBOOK internal research report is set forth below:



49.     Upon information and belief, Plaintiffs allege that even FACEBOOK's own employees believe that because of how FACEBOOK ranks content on its Platform, FACEBOOK's penalties for posting copyright-infringing content are an insufficient deterrent. At least one FACEBOOK representative has admitted that while FACEBOOK may limit the distribution of copyright-infringing content through its repeat infringer policy, *it does not remove that content and that content can still reach a large audience*. Indeed, FACEBOOK has "deprioritized" solutions for cleaning up the copyright-infringing content on its Platform.

50.     Thus, FACEBOOK is complicit because it is aware of the extent of copyright-infringing content on its Platform and provides the infrastructure for, takes measures for, and actively participates in increasing the spread of and engagement with that content.

**WATERMAN's CLAIMS REGARDING THE SUBJECT PHOTOGRAPHS**

51.     WATERMAN owns 10 original photographs registered with the U.S. Copyright Office under U.S. Copyright Reg. Nos. VA 2-211-185, VA 2-223-307, VA 2-247-857, VA 2-251-240, VAu 1-324-752, VAu 1-353-347, and VAu 1-366-084.

52.     B&G owns 15 original photographs registered with the U.S. Copyright Office Under U.S. Copyright Reg. Nos. VA 2-098-383, VA 2-201-678, VA 2-205-488, and VA 2-205-529 (collectively, with WATERMAN's photographs, the "Subject Photographs").

53.     Upon information and belief, Plaintiffs allege that following the publication and display of the Subject Photographs, FACEBOOK (as well as users on FACEBOOK's Platform) uploaded, downloaded, copied, reproduced, published, created derivative works of, distributed, transmitted, stored, modified, manipulated, and/or otherwise used the Subject Photographs without license, authorization, or consent from Plaintiffs on FACEBOOK's Platform and servers (collectively, the "Infringing Uses"). True and correct screen captures of

representative examples of the Infringing Uses are set forth in **Exhibit 1**. The combination and overlap of FACEBOOK's uses of the Infringing Uses, and users' uses of the same, has resulted in a flood of tens of thousands of Infringing Uses which continues to grow.

54.    On numerous dates and occasions, as set forth in **Exhibit 1**, Plaintiffs sent Takedown Notices to FACEBOOK regarding the unauthorized use(s) of the Subject Photographs on FACEBOOK's PLATFORM. The Notices contained the information required for an effective Takedown Notice under the DMCA and FACEBOOK's Terms. On some occasions, Plaintiffs received automated responses from FACEBOOK providing a complaint number. In other instances, FACEBOOK completely failed to respond.

55.    To date, FACEBOOK has not removed the complained-of Infringing Uses.

56.    Plaintiffs' Takedown Notices clearly identified the Subject Photographs, Plaintiffs' ownership of those Works, the Infringing Uses (which are verbatim copies of the Subject Photographs), and where to find those Uses on FACEBOOK's Platform. Yet as of the date below, nearly *ten months* after Plaintiffs' first Notice, FACEBOOK has failed to remove a single Infringing Use.

\*        \*        \*

57.    The story that FACEBOOK once told—that FACEBOOK's Platform is merely an online place where users independently upload and share materials, and FACEBOOK's only involvement is the mere general operation of the Platform—no longer holds, if it ever did. Rather, FACEBOOK's Platform, and the content thereon, is actively managed and updated by FACEBOOK itself, including the data stored on FACEBOOK's servers (which necessarily includes the Infringing Uses). Plus, FACEBOOK's Chief Executive Officer has testified to the United States Congress that FACEBOOK hosts and produces content, pays to help

produce such content, and is responsible for the content that users share on FACEBOOK's Platform.

58.   FACEBOOK's direct infringements of Plaintiffs' copyrights in the Subject Photographs, repeated and continuing failures to remove the Infringing Uses, mockery of (and failure to make a good faith effort to comply with) the DMCA notice-and-takedown process, knowledge of the rampant use of copyright-infringing content on its Platform, failure to implement and actually enforce a repeat infringer policy that adequately deters the proliferation of copyright-infringing content on its Platform, and the financial benefits FACEBOOK has reaped and continues to reap from all of the above, have necessitated this action. Simply put, FACEBOOK cannot avoid liability for the rampant infringement of the Subject Photographs across its Platform.

## FIRST CLAIM FOR RELIEF

(For Direct Copyright Infringement - Against All Defendants, and Each)

59.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

60.   Upon information and belief, Plaintiffs allege that Defendants, and each of them, had access to the Subject Photographs, including through Plaintiffs' websites and social media accounts, viewing the Photographs on FACEBOOK's Platform, viewing the Photographs in Plaintiffs' publications, and/or viewing the Photographs on Internet search engines or third-party websites.

61.   Upon information and belief, Plaintiffs allege that Defendants, and each of them, uploaded, downloaded, copied, reproduced, published, created derivative works of, distributed, transmitted, stored, manipulated, modified, and/or otherwise used the Subject Photographs on FACEBOOK's Platform without license, authorization, or consent from Plaintiffs.

62.   Upon information and belief, FACEBOOK also directly and affirmatively makes the following decisions and commits the following acts

(among others) through both human employees and automated processes designed and controlled by human employees, and without any input, direction, request, or other act or involvement by users:

    a. Selects the Infringing Uses for upload, download, transmission, and/or distribution, as well as initiates and instigates the display of those Uses by selecting, curating, suggesting, and recommending the Infringing Uses on users' News Feeds;

    b. Stores, caches, and/or distributes multiple copies of the Infringing Uses on its servers and Platform;

    c. Modifies and manipulates the Infringing Uses on its Platform for and/or through its Photo Search function, as well as recognizing, classifying, tagging, applying text descriptions to, refining, and enhancing the Infringing Uses; and then making the decisions and committing the acts described in Paragraph 63(a) above; and

    d. Financially benefits from the Infringing Uses by, *inter alia*, displaying and distributing those Uses in conjunction with advertisements, offers, and other sponsored content.

63.    Due to Defendants', and each of their, acts of copyright infringement, Plaintiffs have suffered damages in an amount to be established at trial.

64.    Due to Defendants', and each of their, acts of copyright infringement, Defendants, and each of them, have obtained profits they would not have realized but for their infringement of the Subject Photographs. As such, Plaintiffs are entitled to disgorgement of Defendants', and each of their, profits attributable to the infringement of the Subject Photographs in an amount to be established at trial.

65.    Upon information and belief, Plaintiffs allege that Defendants, and each of them, have committed acts of copyright infringement with actual or constructive knowledge of, or in reckless disregard for, Plaintiffs' copyrights in the Subject Photographs, which renders those acts willful, intentional, and malicious.

## SECOND CLAIM FOR RELIEF

(For Contributory Copyright Infringement - Against All Defendants, and Each)

66.  Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

67.  Plaintiffs allege on information and belief that FACEBOOK knowingly induced, participated in, aided and abetted in, and profited from the illegal reproduction and distribution of the Subject Photographs as alleged hereinabove.

68.  FACEBOOK has had actual knowledge, and/or was aware of the facts of circumstances, of the Infringing Uses (i.e., specific infringing material on its Platform). The information provided in the various Takedown Notices that FACEBOOK received contained types of information called for under its Terms of Service and the DMCA. Moreover, those Takedown Notices presented and formatted that information based on the relationship between the means for finding the Infringing Uses (i.e., screenshots and URLs) and the Infringing Uses themselves.

69.  FACEBOOK has the tools, resources, staff, technological capabilities, and knowledge of/about photographs on its Platform and servers (including the Infringing Uses) to locate and remove the Infringing Uses, and thereby prevent further infringement of GRECCO's copyrights in the Subject Photographs. Indeed, doing so requires only simple measures from FACEBOOK. Yet FACEBOOK has knowingly sat on its hands and utterly failed to remove, or disable access to, the Infringing Uses. Instead, despite its actual knowledge and awareness of the Infringing Uses, FACEBOOK continues to materially contribute to, and/or induce, further use of the Infringing Uses by (1) failing to act; and (2), *inter alia* and upon information and belief, continuing to provide access to the Infringing Uses through the decisions and acts set forth *supra*.

70.     Moreover, FACEBOOK's response, or lack thereof, to GRECCO's Takedown Notices—automated responses asking for additional information already provided multiple times and in multiple convenient formats for ease of reference—show that FACEBOOK is not even attempting to comply with the DMCA notice-and-takedown process in good faith.

71.     FACEBOOK has failed to adopt a repeat infringer policy sufficient to deter copyright-infringing content on its Platform; and, upon information and belief, failed to enforce that policy with respect to the Infringing Uses and the users who posted them.

72.     The combination of FACEBOOK's knowledge and awareness of the Infringing Uses (in addition to knowing full well the extent of copyright infringement that occurs on its Platform), its failure to remove or disable access to the Infringing Uses (or take any meaningful measure(s) to stem the spread of copyright-infringing content) after obtaining that knowledge and awareness, and its failure to adopt an adequate repeat infringer policy and actually enforce the same, removes any potential safe harbor protection afforded to FACEBOOK under the DMCA, 17 U.S.C. § 512.

73.     Plaintiffs allege that FACEBOOK committed contributory copyright infringement with actual knowledge or reckless disregard of their rights such that said acts of copyright infringement were, and continue to be, willful, intentional and malicious.

74.     By reason FACEBOOK's acts of contributory infringement as alleged above, Plaintiffs have been damaged and have suffered damages in an amount to be established at trial.

75.     Due to FACEBOOK's acts of contributory copyright infringement as alleged herein, it has obtained direct and indirect profits it would not otherwise have realized but for its infringement of Plaintiffs' rights in the Subject Photographs. As such, Plaintiffs are entitled to disgorgement of FACEBOOK's

profits directly and indirectly attributable to their infringement of the Subject Photographs, in an amount to be established at trial.

76.     Plaintiffs are informed and believe and thereon allege that Defendants, and each of them, have committed acts of copyright infringement, as alleged above, which were willful, intentional and malicious, which further subjects Defendants, and each of them, to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to one hundred fifty thousand dollars ($150,000.00) per infringement. Within the time permitted by law, Plaintiffs will make their election between actual damages and statutory damages.

### THIRD CLAIM FOR RELIEF

(For Vicarious Copyright Infringement – Against All Defendants, and Each)

77.     Plaintiffs repeat, re-allege, and incorporate herein by reference as though fully set forth, the allegations contained in the preceding paragraphs.

78.     FACEBOOK has the right and ability to supervise its Platform and the content posted thereon, including removing copyright-infringing content. FACEBOOK also has the right and ability to oversee the uses of the Infringing Uses on its Platform. Accordingly, FACEBOOK is in the best position to remove and prevent copyright-infringing content from its Platform.

79.     FACEBOOK also has a direct financial interest in its users' conduct, including with respect to the Infringing Uses, because FACEBOOK realizes profits through the proliferation and dissemination of the Infringing Uses on its Platform.

80.     Plaintiffs allege that FACEBOOK committed vicarious copyright infringement with actual knowledge or reckless disregard of its rights such that said acts of copyright infringement were, and continue to be, willful, intentional and malicious.

81.     By reason of FACEBOOK's acts of vicarious infringement as alleged above, Plaintiffs have been damaged and have suffered damages in an amount to be established at trial.

COMPLAINT

82.    Due to FACEBOOK's acts of vicarious copyright infringement as alleged herein, it has obtained direct and indirect profits it would not otherwise have realized but for its infringement of Plaintiffs' rights in the Subject Photographs. As such, Plaintiffs are entitled to disgorgement of Defendants' profits directly and indirectly attributable to its infringement of the Subject Photographs, in an amount to be established at trial.

83.    Plaintiffs are informed and believe and thereon allege that FACEBOOK has committed acts of contributory copyright infringement, as alleged above, which were willful, intentional and malicious, which further subjects Defendants, and each of them, to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to one hundred fifty thousand dollars ($150,000.00) per infringement. Within the time permitted by law, Plaintiffs will make their elections between actual damages and statutory damages.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment as follows:

a.    That Defendants, each of them, their respective agents, and anyone acting in concert with Defendants and/or their agents, be enjoined from uploading, downloading, copying, displaying, publishing, reproducing, transmitting, distributing, creating derivative works of, modifying, manipulating, and/or otherwise using the Subject Photographs, including an Order requiring Defendants, and each of them, to remove the Subject Photographs from FACEBOOK's Platform(s) and servers;

b.    That Plaintiffs be awarded all profits of Defendants, and each of them, attributable to their infringement, plus all losses of Plaintiffs, the exact sum to be proven at the time of trial; or alternatively, statutory damages as available under 17 U.S.C. § 504;

COMPLAINT

c.  That Plaintiffs be awarded its attorneys' fees and costs of this action under 17 U.S.C. § 505;

d.  That Plaintiffs be awarded pre-judgment interest as allowed; and,

e.  That Plaintiffs be awarded such further legal and equitable relief as the Court deems proper.

## **JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.


DONIGER/BURROUGHS


Dated: January 24, 2025          By:    /s/ *Stephen M. Doniger*
Stephen M. Doniger, Esq.
Kelsey M. Schultz, Esq.
*Attorneys for Plaintiffs*